.W. H. WOODBURY v. A. W. KING.

(Filed 27 May, 1910.)

1. **Deeds and Conveyances—Attorney in Fact—Insufficient Execution.**

A paper-writing purporting to be a deed to land by an attorney in fact does not bind the principal, if not signed and sealed by the attorney in fact *eo nomine.*

2. **Same—Standing Timber—Contract to Convey—Title.**

Deeds and conveyances of standing timber are governed in their effect by the law regarding a conveyance of real property; and, in this case, the paper-writing, invalid as a deed because not properly sealed and signed by an attorney in fact, is admitted to be sufficient as a contract to convey the standing timber and sawmill plant.

3. **Deeds and Conveyances—Standing Timber—Contract to Convey—Vendor and Vendee—Outstanding Title—Purchase Price—Notes—Abatement.**

In defense to an action upon a note, between the original parties, given for the purchase price of standing timber upon lands under a contract to convey the same, the defendant, the vendee, may show in abatement of the agreed purchase price that, under an outstanding title superior to that of his vendor, he had been prevented from receiving the number of trees embraced by the description in his conveyance, thus proving a partial failure of title and a shortage or deficiency in the number of trees conveyed.

APPEAL from *Ferguson, J.,* at August Term, 1910, of CHEROKEE.

The plaintiff sued the defendant upon the following note:

$1,500.                           MURPHY, N. C., 16 January, 1906.

Sixty days after date I promise to pay to the order of W. H. Woodbury $1,500, at the Bank of Murphy, Murphy, N. C., for value received. Received and subject to contract of 16 May, 1904. We, the makers and indorsers, waive demand, protest and notice. All demands and offsets against payee herein named are waived in favor of any *bona fide* holder.

(Signed)          A. W. KING.

The defendant, admitting the execution of the note, rested his defense upon the grounds that the note sued upon was part consideration of the purchase by him of a sawmill and outfit and timber trees standing on various tracts of lands in Clay County; that there were titles outstanding to the lands on which the trees stood, better and superior to the title sold by plaintiff to defendant; that there was an actual large deficiency in the number of trees sold; that while he had paid all the purchase price of $5,500 except $1,500, he had not, at the times of such payment, nor at the time of giving the note sued upon, which was a renewal note, discovered either the defect of title or shortage in the number of trees. No complaint was made by him until shortly before this suit was begun, April, 1906. The negotiations between plaintiff and defendant were reduced to writing, first in a memorandum agreement, dated 13 May, 1904, in which plaintiff agreed to sell to the defendant "the balance of the marked timber that is uncut in Clay County, and a sawmill complete that is in the same section. Such titles to be made as said Woodbury has authority to make."

Second. A deed dated 16 May, 1904, in which plaintiff, as attorney in fact of U. A. Woodbury, "hereby grants, bargains, sells and conveys to the party of the second part, his heirs, executors, administrators and assigns, all those certain timber trees standing, lying, being and situate in Clay County, North Carolina, which were purchased from the then owners thereof, in January, 1890, and the deeds thereof recorded in said county, at or about that date, and all other timber deeds bought by the said U. A. Woodbury, in said county, whether of record in said county or not, reference being made to said records and deeds and to the memoranda on the backs thereof for the number and kind of trees therein and thereby conveyed for greater certainty, which memoranda shall be taken as a part thereof, a schedule of which trees shall be made by party of the first part and attached hereto; excepting and reserving from said sale the trees cut and manufactured into timber by him, said trees being then marked with a cross (×)." Then follows a description of the sawmill plant and its fixtures and parts; then the terms of payment of the property purchased as agreed upon, and it is further stipulated: "At the date of payment of the first installment of the purchase money ($1,833.33) party of the first part shall execute and deliver to the party of the second part a fee-simple deed or deeds for all the timber trees on Shooting Creek, and shall at the same time execute and put in escrow in the Bank of Murphy, N. C., a bill of sale of the mill, boiler, engine and fixtures; but the use and possession of said mill shall be

delivered to the party of the second part, and party of the second part shall every three months thereafter, until last payment is made, account and pay for all trees cut and sold by him from said lands, which amount shall be credited on the amount due on the contract, unless otherwise previously paid. When second payment is made, a deed or deeds shall be executed and delivered for the proportionate part of the trees paid for by said payment when said trees may be cut; and when the third payment is made a deed shall be delivered to the party of the second part for the remaining trees, and the bill of sale of the mill and fixtures shall be delivered to the same, the said bill of sale having been retained in the meantime as security for the faithful performance of the contract by the party of the second part."

The consideration was $5,500, divided into three payments of $1,833.33 each, one of these being made in cash and the others represented by two notes. The sawmill and fixtures were delivered to the defendant, and he began to cut the timber. The statement of the trees cut was never made as stipulated, and there was no evidence at the trial of the number cut. It appeared that he owned timber lands in the same section.

The defendant offered in evidence the timber deeds to U. A. Woodbury, recorded in Clay County, all dated in January, 1890, and embraced in a memorandum attached to the deed to defendant, of 16 May, 1904. In these deeds the property granted is thus described: "has bargained and sold and by these presents do hereby bargain and sell, grant and convey unto the parties of the second part (U. A. Woodbury), their heirs and assigns, all the poplar, ash, cherry and walnut timber trees having an average diameter of twenty (20) inches and upward, marked thus (✕), now growing upon the lands of the party of the first part, described as follows (description), together with right of way, etc."

The defendant offered then to show outstanding titles to the Groves land, Groves himself being one of the grantors to U. A. Woodbury, better and superior to said Groves' title, and offered "to show by the record of the titles themselves, and by the witness Meese, a surveyor, that a number of the tracts covering a large percentage of the timber claimed by U. A. Woodbury, and referred to in the contract of 16 May, 1904, was owned under older and superior titles by other persons than those from whom U. A. Woodbury purchased, and under whom he claims to own such timber," and there was a large shortage in the number of timber trees from the memorandum furnished defendant. Upon plaintiff's objection, his Honor excluded this testimony, and defendant excepted.

It was not denied by defendant, as testified to by plaintiff, that the defendant was furnished the deeds and all memoranda, as to the number and kind of timber trees, by plaintiff, several months prior to the date of the written agreements between plaintiff and defendant; that defendant was notified by plaintiff that he must count the trees; that plaintiff declined to make an actual count; that plaintiff had been sawing in the timber and was so engaged at the time the negotiations were concluded, to the knowledge of defendant. His Honor, without objection, submitted the following issues:

1. Is the plaintiff the owner of the note sued upon?

2. Has the note or any part thereof been paid?

3. What number of trees, if any, were cut off the Groves land prior to the contract of 16 May, 1904, by W. H. Woodbury, or with his knowledge and consent?

4. What is the value of said trees?

His Honor instructed the jury to answer the first issue "Yes," if they believed the evidence; the second issue "No," and the jury responded to the third issue, 47 trees, and fixed their value, in answer to the fourth issue, at $94. It was not seriously contended that the plaintiff was not the owner of the note; and it was admitted that no payment had been actually made upon the note, unless, as the defendant contended, he was entitled under his counterclaim and by way of set-off to have the value of the trees embraced in the shortage credited on the note, which he contended would extinguish it. Upon the verdict, judgment was rendered for the plaintiff, and defendant appealed.

*Dillard & Bell* for plaintiff.

*Zebulon Weaver, E. B. Norvell, George A. Shuford, Axley & Axley* and *Ben Posey* for defendant.

MANNING, J., after stating the case: The paper-writing of 16 May, 1904, purporting to be a deed executed by W. H. Woodbury, the plaintiff, as attorney in fact of U. A. Woodbury, and the defendant, was not properly executed to bind U. A. Woodbury, because it was not signed and sealed by his attorney in fact *eo nomine,* but only by W. H. Woodbury individually. It was conceded by the defendant to be good as a contract to convey, and it was by its express language not considered effective as a deed, for it stipulates for deeds to be executed proportionately to the property described as the payments are made. It was undoubtedly sufficient to pass the title to the sawmill plant and machinery, and as an executory contract to convey the

standing timber. In *Hawkins v. Lumber Co.,* 139 N. C., 160, this Court said: "It is an established principle in this State that growing timber is a part of the realty, and deeds and contracts concerning it are governed by the laws applicable to that kind of property. *Mizzell v. Burnett,* 49 N. C., 249; *Moring v. Ward,* 50 N. C., 272; *Mizzell v. Ruffin,* 118 N. C., 69." *Timber Co. v. Wilson,* 151 N. C., 154.

The two rulings of his Honor chiefly urged upon us by the defendant as erroneous were: 1. His refusal to permit the defendant to show by the record of titles an outstanding title superior to the title of U. A. Woodbury for some of the standing timber contracted to be sold. 2. His refusal to permit defendant to prove that, by actual count of the trees standing and contracted to be conveyed, there was a shortage of 1,196 in a total of 2,030 trees. In *Leach v. Johnson,* 114 N. C., 87, it was held that where one contracts for the purchase of land without any agreement for a warranty of title, and thereafter and before the execution of a deed, encumbrances are discovered, he cannot be compelled to take the defective title or pay the bonds given for the price of the land, for an agreement to take a clear deed without warranty is not a waiver of the right to demand a clear title, citing *Batchelor v. Macon,* 67 N. C., 181; *Castlebury v. Maynard,* 95 N. C., 281, and other cases.

In *Castlebury v. Maynard, supra, Mr. Justice Ashe,* speaking for the Court, said: "The contention of the parties presents for our consideration the question whether the plaintiff can make a good title to the land described in the complaint. If he cannot, it would be against equity and good conscience that he should recover the amount of the note in suit, for a purchaser of land is never required to accept a doubtful title. *Batchelor v. Macon,* 67 N. C., 181; *Motts v. Caldwell,* 45 N. C., 289." In *Timber Co. v. Wilson,* 151 N. C., 154, *Mr. Justice Brown,* speaking for the Court, said: "It is further contended that the defendants cannot make a good title to the timber, independent of the conveyance to the Tilghman Company, and for that reason cannot be made to perform the contract. This might avail the plaintiff if it was resisting the performance on its part, but it cannot avail these defendants, for it is well settled that, though the vendor is unable to convey the title called for by the contract, the purchaser may elect to take what the vendor can give him and hold the vendor answerable in damages as to the rest. *Kores v. Covell,* 180 Mass., 206; *Corbett v. Shulte,* 119 Mich., 249; 29 Am. and Eng. Enc., 621." *Wilcoxon v. Galloway,* 67 N. C., 463; 1 Warvelle on Vendors, 349; *Haynes v. White,* 55 Cal., 38; *McCroskey v. Ladd,* 96 Cal., 455.

Different principles and different requirements apply where a deed has been made and delivered and the purchaser then seeks, as a defense to an action brought to recover the purchase money, to set up damages for a partial failure of title. This difference is illustrated by the cases of *Etheridge v. Vernoy,* 70 N. C., 713; *Foy v. Houghton,* 85 N. C., 168; *Anderson v. Rainey,* 100 N. C., 321; *Woodbury v. Evans,* 122 N. C., 779.

In *Etheridge v. Vernoy, supra,* an action brought to recover the balance on a note for the purchase price of land, where the deed had been executed and a note and mortgage given to secure it, this Court said: "In contracts for the sale of land, it is the duty of purchasers to guard themselves against defects of title, quantity, encumbrances and the like; if they fail to do so, it is their own folly, for the law will not afford them a remedy for the consequences of their own negligence. But if representations are made by the bargainor, which may reasonably be relied on by the purchaser, and they constitute a material inducement to the contract, and are false within the knowledge of the party making them, and they cause damage and loss to the party relying on them, and he has acted with ordinary prudence in the matter, he is entitled to relief. *Walsh v. Hall,* 66 N. C., 233."

And this doctrine applies with equal force where the ground of relief, instead of fraudulent representations, is mutual mistake. *Wilcoxon v. Calloway,* 67 N. C., 463. In that case this Court said: "But upon a contract for 100 acres, even though there is no suggestion that the vendee, for any reason, desired exactly that quantity, or that quantity was of any value except as *quantity,* yet a deficiency of one-third must be held material, and would probably entitle the vendee to rescind the contract if he chose to do so, *or at all events* to an abatement of the price."

As to the rule for determining the amount of abatement of the price for the deficiency, the Court said: "In this case, however, it does not appear that any part of the land has been improved, or that there is anything to give any one part of it extraordinary value over any other part, and we do not see why it will not be fair and reasonable to estimate the value of the deficiency at the average price per acre." This seems to have been adopted by the jury in fixing the value of the 47 trees cut from the Groves land allowed as an abatement.

In view of the authorities above cited, and accepting their reasoning as conclusive upon us, we are of the opinion that his Honor erred in not permitting the defendant to prove a partial failure of title and the shortage or deficiency in the num-

ber of trees conveyed—which would be in reality a failure of title—and in not permitting the jury to determine the abatement of price to the defendant, if his contentions in these particulars shall be accepted by the jury as true. For these errors, the judgment is reversed and a new trial awarded.

New trial.